RMT:DKK/MTK/JEA
F. #2018R00673

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | C O M P L A I N T |
| - against - | (18 U.S.C. § 922(k)) |
| ASHIQUL ALAM, | 19-M-531 |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

SEAN DILLON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

Upon information and belief, on or about June 6, 2019, within the Eastern District of New York, the defendant ASHIQUL ALAM did knowingly and intentionally possess and receive firearms, to wit: two Glock 19 9mm semi-automatic pistols, which firearms had the manufacturer's serial numbers removed, obliterated and altered and which had been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Section 922(k))

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest, I have not set forth every fact learned during the course

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the New York Joint Terrorism Task Force ("JTTF"), and have been with the JTTF since 2018. As a Special Agent, I have investigated numerous matters during the course of which I have conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants, and used other investigative techniques to secure relevant information. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

2.      In the course of an investigation by the JTTF, ASHIQUL ALAM ("ALAM") bought and received two firearms with obliterated serial numbers from undercover law enforcement officers.

## THE DEFENDANT

3.      According to records from federal immigration authorities, ALAM is a 22-year old Bangladeshi citizen who is a Lawful Permanent Resident ("LPR") of the United States. ALAM lives in Queens, New York.

---

of this investigation. At various points in this affidavit, I will offer my interpretations of certain communications in brackets and otherwise. My interpretations are based on my knowledge of the investigation to date and review of prior communications, the contents and context of the communications, prior and subsequent communications, conversations with officers, and my experience and familiarity with terrorist organizations generally. Summaries of communications do not include references to all the topics covered during the course of the communications. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. While transcribers have attempted to transcribe conversations accurately, to the extent that quotations from these communications are included, these are preliminary, not final, transcriptions.

## SUMMARY OF EVIDENCE

4. An undercover law enforcement officer ("UC-1") first met ALAM in approximately August 2018 and continued meeting with him until June 6, 2019. During those meetings, ALAM repeatedly spoke approvingly about various terrorist attacks, including the September 11th terrorist attacks. In addition, the defendant made a number of statements of admiration for various terrorist organizations, including the Islamic State of Iraq and al-Sham ("ISIS"). During his meetings with UC-1, ALAM also repeatedly expressed interest in purchasing firearms and explosives for use in a terrorist attack in the New York City area.[2]

5. On or about September 11, 2018, UC-1 met with ALAM. During their meeting, ALAM discussed deceased al-Qaeda leader Usama Bin Laden and the September 11th terrorist attacks. ALAM stated that Bin Laden's "mission is a complete success, thousands of American soldiers died and trillions of their monies gone in the war." ALAM also stated that "it was the duty of Muslims, you know, to make the khalifa."

6. On or about September 15, 2018, ALAM met with UC-1 and again spoke about Bin Laden's speeches. When UC-1 inquired if anyone could replace Bin Laden, ALAM stated "yeah . . . he did his job[.] He did what he is supposed to do. Now it's up to us."

7. On or about September 27, 2018, ALAM and UC-1 met and discussed the use of suicide vests. When UC-1 asked ALAM if ALAM would use a vest, ALAM

---

[2] All the meetings between ALAM and undercover government agents herein were recorded by the agents. Unless otherwise indicated, the defendant's statements set forth herein are summarized in sum, substance and relevant part.

stated "yeah man, that shit is painless . . . you die right away.  Better than prison, right?" Later in the conversation, ALAM stated that they had "two options" to use the suicide vest in either an attack in New York City in Times Square during a large event, or in Washington D.C. to kill a senior government official.

8. On or about December 6, 2018, UC-1 and ALAM met and again discussed carrying out an attack in New York City.  ALAM also lamented not having access to the types of resources he deemed necessary to carry out the "plan."  When UC-1 asked ALAM what types of resources were needed, ALAM stated that they needed to obtain bomb-making materials, including means to detonate the suicide vest.  ALAM also said that they would need "a circle of balls and . . . when it blows up those balls explode and the metal goes everywhere.  The more better the explosives, the more farther the shrapnel could go."  At one point during the meeting, ALAM borrowed UC-1's cellular telephone to search for and then listen to speeches by Anwar al-Awlaki.[3]  Later in the meeting, ALAM discussed obtaining AR-15 assault rifles to kill law enforcement officers.

9. On or about January 4, 2019, UC-1 again met with ALAM.  During their meeting, UC-1 and ALAM agreed to conduct a "recon," meaning reconnaissance, of Times Square.  UC-1 and ALAM then traveled together to Times Square.  When they arrived, ALAM used his cellular telephone to make a video recording of the area.  ALAM explained to UC-1 that he was looking for potential targets.  UC-1 thereafter asked ALAM

---

[3]  Before his death, Awlaki was an influential American-born Islamic lecturer and leader of al-Qaeda in the Arabian Peninsula who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to lands around the world where Muslims were perceived to be under attack.

what next steps they would take. ALAM responded that they "would have to become ready. Like in a war, you know. You make the plans, you do the recon." Additionally, ALAM asked UC-1 which areas within Times Square would be considered "more important" targets to attack. When UC-1 suggested the area around Father Duffy Square[4], ALAM stated, "That is the place we hit. That is the place." At the end of their meeting, ALAM expressed excitement about the reconnaissance and stated that "we did the recon today, perfect" and that conducting a "recon is important, trust me."

        10. On or about January 16, 2019, ALAM and UC-1 traveled to a shooting range in Pennsylvania. While driving to the range, ALAM and UC-1 discussed ISIS, and ALAM stated, "I want to die fighting man." Once they arrived at the range, ALAM and UC-1 received a shooting lesson from an employee of the range. Afterwards, ALAM stated to UC-1, "damn, I want to carry that gun so badly, all the time."

        11. While driving home from the range, that same day, ALAM and UC-1 discussed purchasing firearms from an associate of UC-1. ALAM stated that making such a purchase was a huge risk, but not a bad idea if they could avoid being arrested by not carrying the firearm on their person all the time. ALAM stated that he hoped UC-1's associate was not a police officer. ALAM informed UC-1 that he was "willing to pay like $500." During the drive, ALAM also searched for firearm prices on the internet using his cellular telephone. Additionally, although an employee at the range told ALAM it would be illegal to bring misfired bullets back to New York City, ALAM brought several such bullets

---

[4] Father Duffy Square is located in Times Square.

back with him. On the way home, ALAM and UC-1 also discussed the best places to hide a weapon in a car.

12. On or about January 21, 2019, UC-1 again met with ALAM. During the meeting, ALAM suggested they do another "recon" of Times Square, stating, "So let's hit it bro, our project, Times Square." When UC-1 asked exactly what ALAM meant, ALAM stated, "the whole thing, like last time . . . Only this time we should be more coordinated." During the drive to Times Square that followed, ALAM described how much he enjoyed the firearms range and stated that next time he wanted to shoot an AR-15. Once in Manhattan, ALAM began filming with his cellular phone near 36th Street and 6th Avenue, and stated "all right, second recon start[s] now." ALAM stated that if they completed an attack successfully, then they would become "legends."

13. While in Times Square on or about January 21, 2019, ALAM pointed to an area within Times Square and stated, "most of the people are there you know, it makes more impact." When UC-1 asked ALAM where the spot was, ALAM explained that it was in Father Duffy Square. During this trip to Times Square, ALAM also asked UC-1 whether UC-1 spoke with his associate about obtaining a firearm. When UC-1 asked if a firearm would be used in their plan to attack Times Square, ALAM stated, "yeah man, why not . . . we will talk in detail, but . . . we should get it."

14. During subsequent meetings in February 2019 between ALAM and UC-1, ALAM continued to express interest in purchasing a firearm from UC-1's associate. For instance, on or about February 13, 2019, ALAM told UC-1 that he would use a firearm to "try to shoot down fags" and, when UC-1 again asked if firearms would be used in their "plan," ALAM replied "yeah, Inshahallah, if it comes to that, yeah."

15. On or about March 14, 2019, ALAM and UC-1 again met. While driving on the Westside Highway in UC-1's vehicle, ALAM pointed to a building and asked if it was the new World Trade Center. When UC-1 responded affirmatively, ALAM stated, "More for us to break." When UC-1 asked how ALAM would conduct such an attack on the World Trade Center, ALAM replied, "probably a rocket launcher, like a huge one." UC-1 then asked how ALAM would conduct an attack with "the tools we have today." ALAM replied in a whisper, "Available tools, probably a bomb." During this meeting, ALAM again asked UC-1 about his associate "with the guns." UC-1 stated that they would have to go see the associate if they wanted to purchase firearms. ALAM replied, "Okay, let's go see."

16. On or about March 21, 2019, ALAM and UC-1 met. During this meeting, UC-1 asked what would make ALAM happy. ALAM replied "seeing the flag of Islam on the Twin Towers or the Empire State Building." ALAM again reminded UC-1 that ALAM wanted to purchase a firearm and asked, "When are we going to meet [UC-1's associate]?" UC-1 then placed a call on speaker phone to his "associate"—actually a second undercover officer ("UC-2")—regarding the purchase of firearms. During the call, UC-2 stated that UC-2 had a reliable weapons supplier who could obtain whatever weapons ALAM wanted. After the call, ALAM told UC-1 that he would be interested in buying a Glock 9mm pistol.

17. On or about April 11, 2019, ALAM and UC-1 met again and discussed ALAM's interest in purchasing firearms from UC-2, the "associate" of UC-1. During the conversation, ALAM asked UC-1 to call UC-2 to set up a meeting and negotiate a price for

the firearms. UC-1 then called UC-2 on a speaker phone as ALAM listened. During the call, UC-2 agreed to meet with ALAM and UC-1 to discuss a firearms purchase.

18. Later that same day, ALAM and UC-1 met with UC-2. During the meeting, ALAM told UC-2 that ALAM wanted to buy two Glock G19 semi-automatic pistols. ALAM then asked whether the guns were bought "legally or from the streets," and UC-2 explained that the guns were obtained illegally. UC-2 explained to ALAM that his associate, a third undercover officer ("UC-3"), was the source of all of firearms sold by UC-2. ALAM thereafter confirmed that he wanted to purchase two Glock G19 semi-automatic pistols and that he was prepared to pay $2,000 in total for both of them. ALAM also discussed with UC-1 and UC-2 concerns about purchasing the firearms from UC-2, including that it would be too risky to buy them on the street and then drive with them in a vehicle. ALAM suggested that it would be better to buy the guns in a residence because law enforcement officials need a search warrant to search a residence.

19. ALAM further confirmed his interest in purchasing firearms in subsequent conversations with UC-1. For example, on or about April 18, 2019, ALAM and UC-1 met and, within a minute of meeting with UC-1, ALAM asked UC-1 if UC-1 had "good news or no" about "the thing." When UC-1 asked ALAM if he was "talking about the gun guy," ALAM nodded in agreement. ALAM then asked UC-1 when they would be traveling again to the shooting range in Pennsylvania. ALAM and UC-1 thereafter discussed using rifles at the range, and ALAM expressed an interest in potentially purchasing a rifle.

20. On or about April 25, 2019, ALAM and UC-1 again traveled to a shooting range in Pennsylvania. While driving to the range, ALAM told UC-1 that ALAM

had a Lasik eye surgery appointment in the coming weeks and asked for assistance in driving to and from the appointment. When UC-1 asked ALAM why he was taking a risk and having eye surgery, ALAM replied: "Let's say we are in an attack, right, say that my glasses fall off. What if I accidentally shoot you? You know what I mean. Imagine what the news channel would call me [laughing] the 'Looney Tunes Terrorist' [laughing] or the 'Blind Terrorist' [laughing]." UC-1 then asked whether ALAM and UC-1 would use a firearm during an attack, to which ALAM stated that ALAM would potentially use a firearm after first using a bomb. On their return from the gun range, ALAM and UC-1 further discussed the purchase of firearms from UC-2 and UC-3 and an appropriate price for a Glock G19 semi-automatic pistol.

21. On or about May 2, 2019, ALAM and UC-1 met again and discussed purchasing firearms. During the conversation, ALAM asked UC-1 if he had spoken with UC-2. UC-1 told ALAM that he had spoken with UC-2, and UC-2 had explained to UC-1 that the guns would have the serial numbers scratched off. ALAM replied, "Oh, that's good man." When UC-1 told ALAM that UC-2 would be calling over the weekend regarding when to meet, ALAM stated, "Yeah man, that's good. Fuck. This year is going to be good man, I have a feeling." On or about May 5, 2019, UC-1 and ALAM communicated via cellular telephone. UC-1 told ALAM that UC-2 needed to meet with UC-3 and that UC-3 did not have firearms to sell immediately, but UC-3 wanted to show ALAM and UC-1 what types of firearms UC-3 could obtain and sell. ALAM agreed to meet UC-1, UC-2 and UC-3 at UC-1's apartment later that week.

22. On or about May 9, 2019, ALAM and UC-1 met at UC-1's apartment in Brooklyn. While waiting on the arrival of UC-2 and UC-3, ALAM told UC-1 that

ALAM hoped the police did not come through the front door of the apartment. After UC-2 and UC-3 arrived at the apartment, UC-2 opened a suitcase containing firearms, including handguns and an Avtomat Kalashnikova ("AK-47") assault rifle, as well as hand grenades. After UC-2 and UC-3 explained that all of the firearms have serial numbers scratched off, ALAM asked if he could hold the Glock G19 semi-automatic pistol being shown to him. ALAM further inquired about the AK-47 and asked UC-3 whether it was a fully automatic rifle, and UC-3 confirmed that the AK-47 was fully automatic. Further, ALAM, after observing the grenades, stated that they "look like Russian-made grenades." As UC-3 was leaving the apartment, ALAM asked UC-3 for an estimate on the two Glock G19 semi-automatic pistols, to which UC-3 replied "let me check, let me see what I can do."

23.     After UC-2 and UC-3 left the apartment, ALAM stated, "Damn man, he's rocking an AK" and asked UC-1 if he wanted an AK-47. ALAM then told UC-1 that they should buy only one AK-47, because two would be too expensive. Later in the conversation, UC-1 asked ALAM how ALAM would use the AK-47 as part of their plan. ALAM explained that the AK-47 could be useful as part of a suicide vest attack. ALAM also discussed buying grenades and told UC-1 that grenades could do significant damage and that they could buy grenades if they are unable to find explosives. ALAM explained that a grenade could "take out at least eight people" if it were to explode indoors, such as in a mall, or in a large gathering. At the end of the conversation, ALAM told UC-1 that he first wanted to buy the two Glock pistols. ALAM further stated, "Damn bro, I'm happy," to which UC-1 asked, "Why?" ALAM stated, "You know . . . the guns . . . progress."

24.     On or about May 16, 2019, ALAM and UC-1 met and discussed their plans to purchase firearms from UC-3. During the conversation, ALAM asked UC-1 if he

had spoken with UC-2 about obtaining the two Glock pistols and asked UC-1 whether they should buy grenades as well. ALAM thereafter began to search for and watch YouTube videos of gun reviews on his cellular phone, including a review for a Glock G19 semi-automatic pistol. ALAM and UC-1 then agreed to meet with UC-2 in person to discuss purchasing the two Glock pistols. On or about May 21, 2019, ALAM and UC-1 communicated via cellular telephone. UC-1 told ALAM that UC-2 would meet with them to discuss what firearms they wanted to buy. ALAM agreed to meet UC-1 and UC-2 later that week.

25. On or about May 23, 2019, ALAM and UC-1 met UC-2 at UC-1's apartment in Brooklyn. During that meeting, ALAM told UC-2 "that we decided on the Glock 19," but asked UC-2 whether UC-2 could obtain a recent model of the firearm because ALAM did not want to buy an older model. ALAM then asked UC-2 whether UC-2 could obtain ammunition and stated: "What is the point of getting a gun without ammo?" ALAM thereafter told UC-2 that ALAM wanted to buy two boxes of ammunition along with the two Glock 19 semi-automatic pistols. ALAM and UC-2 also discussed the price of the firearms, and ALAM agreed to pay $800 for the two Glock pistols.

26. On or about May 29, 2019, ALAM and UC-1 met. During that meeting, ALAM told UC-1 that after they purchased the two Glock pistols ALAM wanted to buy a grenade. When UC-1 asked ALAM if they should order grenades from UC-2, ALAM told UC-1 that ALAM and UC-1 should first buy the pistols and allow UC-2 to get comfortable with ALAM and UC-1. UC-1 then called UC-2 on a speaker phone as ALAM listened. During the call, UC-2 told ALAM and UC-1 that UC-3 would meet ALAM, UC-1 and UC-2 at UC-1's apartment in Brooklyn the following week to sell the two Glock pistols

Case 1:19-mj-00531-CLP Document 1 Filed 06/07/19 Page 12 of 13 PageID #: 12

to ALAM and UC-1. When UC-2 asked ALAM and UC-1 if they wanted to buy anything else, ALAM stated, "For now we are satisfied but later on we are going to ask for some other stuff."

27. On or about June 6, 2019, ALAM and UC-1 met and traveled to UC-1's apartment. While traveling to UC-1's apartment in Brooklyn, UC-1 asked ALAM if he was "ready for this. Are you sure you want to do this?" ALAM replied, "Yeah, yeah, of course." Later in the conversation, ALAM told UC-1 that he wanted to obtain a New York State enhanced driver license. When UC-1 asked ALAM why he wanted an enhanced driver license, ALAM told UC-1 that an enhanced driver license would allow ALAM to "walk on to a military base" so that he could "blow it up."

28. After arriving at UC-1's apartment, ALAM and UC-1 met UC-2 and UC-3 to complete the firearms transaction. During that meeting, UC-3 told ALAM and UC-1 that the price for each of the Glock 19 pistols was $400 and that UC-3 included a box of ammunition for free. ALAM immediately responded "thanks a lot for the ammo" and asked UC-3 about the model of the Glock 19 pistols. UC-2 then showed ALAM and UC-1 that each of the firearms had the serial numbers scratched off and ALAM asked about the process used to scratch off the serial numbers. ALAM and UC-1 then paid $400 to UC-3 for each of the two Glock 19 pistols. ALAM provided $400 towards the purchase, all in $100 bills. Shortly thereafter, UC-3 asked ALAM if ALAM had any questions, to which ALAM asked UC-3 whether ALAM could buy a silencer from UC-3. ALAM also asked UC-3 whether the Glock 19 pistol that he just purchased was compatible with a silencer. ALAM again thanked UC-2 and UC-3 for selling ALAM and UC-1 the firearms. Following the purchase of the firearms, ALAM was placed under arrest by law enforcement officials.

29. I have conferred with a Nexus expert, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who has informed me that the Glock 19 9mm semi-automatic pistols bought and received by ALAM were not manufactured in the state of New York.

WHEREFORE, your deponent respectfully requests that the defendant ASHIQUL ALAM be dealt with according to law.

_____
SEAN DILLON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
7th day of June, 2019

_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK